*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LKH,

Petitioner-Appellee,

v

ADB,

Respondent-Appellant.

UNPUBLISHED
February 20, 2020

No. 345948
Clinton Circuit Court
Family Division
LC No. 2018-028001-PP

Before: LETICA, P.J., and GADOLA and CAMERON, JJ.

PER CURIAM.

Respondent appeals the trial court's order denying his motion to terminate an April 2018 ex parte personal protection order (PPO) entered in favor of petitioner. We reverse and remand for entry of an order granting respondent's motion.

## I. FACTS AND PROCEDURAL HISTORY

The current appeal has its genesis in the events occurring in early November 2013.

## A. THE 2013 ASSAULT

On petitioner's 42nd birthday, petitioner believed that respondent, her then 47-year-old boyfriend, had communicated with his ex-girlfriend. Petitioner later confronted respondent in the bedroom and asked to see his phone. When petitioner checked respondent's call history, she directed respondent to go to the garage. According to petitioner, while they were still in the bedroom, respondent leaned his forearm into her neck, climbed on top of her, called her a vulgar name, and explained that he was only talking to his ex-girlfriend about Friend of the Court paperwork. Petitioner retorted that that did not matter because he had lied to her again and she directed him to leave her alone. Upon seeing her daughter in the area, petitioner once again directed respondent to go.

Thereafter, petitioner and respondent encountered each other in the garage. Their verbal altercation continued with petitioner informing respondent that they were through and asking

him if he thought she was stupid. When respondent replied affirmatively and, again, called petitioner a name, she told him to "get the f*** out of my house [and] life."

Thereafter, respondent used his fist to strike petitioner in the face, saying that he wished she died. Respondent then attempted to drag petitioner out of the garage and said he was going to kill her.[1] Petitioner fought back and respondent started to let up before calling petitioner yet another derogatory name.

Petitioner kicked respondent in the groin and respondent left as petitioner's teenage son came outside, possibly threw a rock at respondent's car, and told respondent to leave. As respondent departed, he threatened to ensure that petitioner's children were removed from her care.

When the police later interviewed respondent, he wanted to press charges against petitioner for assaulting him. Respondent reported that petitioner was quite jealous. That particular morning, petitioner had repeatedly texted respondent and he had failed to respond because he was busy. Petitioner then began to accuse respondent of cheating on her, and, by the time respondent arrived home, petitioner was angry and wanted to see his phone. After discovering an earlier 13-minute phone call to respondent's ex-girlfriend, petitioner began to yell at and strike respondent. Respondent was in the process of leaving when petitioner went out to the garage and began to strike him again. According to respondent, he threw his left hand back and hit petitioner's face in order to get her off him. Recognizing that petitioner was injured by his blow, respondent claimed that he intended to aid her; however, she began striking him again, and, at that point, her children came outside and directed him to leave. Respondent retreated to his ex-girlfriend's house.

As a result of respondent's assault, petitioner suffered a broken nose, a laceration to the right side of her nose, bodily bruising, a bite mark on her left tricep, and a chipped tooth. Respondent had small scratches on his face and had an offensive wound on his left middle finger knuckle, presumably from punching petitioner in the face.

While there were "no reported previous disputes" between petitioner and respondent, petitioner alleged "there were previous encounters," one of them resulting in a bruise on her right bicep. However, both petitioner and respondent also divulged that petitioner had caused respondent to suffer a black eye on at least one occasion.

As a result of respondent's assault, he was charged criminally with assault with the intent to commit great bodily harm less than murder, MCL 750.84, domestic violence, second offense, MCL 750.81(4), and aggravated assault, MCL 750.81a. The prosecutor later amended the

---

[1] Petitioner reported to police that respondent had threatened to kill her during their argument and that she responded by telling him to "bring it."

charges to add assault with the intent to commit murder, MCL 750.83, notifying defendant that he was being charged as a fourth-felony offender, MCL 769.12.[2]

## B. THE 2013 PPO

Within weeks of the initial criminal charges, petitioner also requested a PPO against respondent. On November 21, 2013, the trial court entered an ex parte PPO prohibiting respondent from engaging in various acts, including assaulting petitioner and her minor children or stalking petitioner by following her, appearing within her sight, contacting her by telephone, and sending her other communications. Respondent was served with the 2013 PPO.

Nevertheless, after Christmas 2013, respondent attempted to contact petitioner and sent her several texts over the course of a few days. Some of these texts expressed respondent's remorse; others, his love for petitioner. All of them, however, violated the 2013 PPO as well as respondent's bond conditions.[3]

## C. THE 2013 ASSAULT CONVICTION

In May 2014, pursuant to a *Killebrew*[4] agreement that the sentencing guidelines would be scored to range from 5 to 34 months, respondent pleaded *nolo contendere* to assault with intent to do great bodily harm less than murder, MCL 750.84. The prosecution dismissed the remaining criminal charges.

At sentencing, respondent said that he was "truly sorry" and "ashamed" of his conduct. To his credit, respondent had obtained certificates for attending seminars addressing anger resolution, marriage and family relationships, and foundations for successful living.

The prosecution highlighted respondent's 1991 MDOP conviction, which began as a domestic situation, and his 1999 misdemeanor domestic-violence conviction. Moreover, the prosecution described respondent's 2005 conviction for cutting telephone lines as "essentially a domestic situation."

Noting that respondent was last sentenced to prison in 1993, the trial court imposed the maximum-minimum 34-month sentence to punish respondent and to protect society. As a third-felony offender, the court sentenced respondent to a maximum of 20 years' imprisonment. The

---

[2] Respondent had three felony convictions from May 1992—malicious destruction of property, MCL 750.377a, carrying a concealed weapon in a motor vehicle, MCL 750.227, and felony-firearm, MCL 750.227b—and one felony conviction from 1993—receiving and concealing stolen property, MCL 750.535.

[3] It appears that respondent was also charged with aggravated stalking, MCL 750.411i, but the prosecution nolle prossed that charge in early 2014.

[4] *People v Killebrew*, 416 Mich 189; 330 NW2d 834 (1982).

trial court noted that if respondent availed himself of prison programing, there might be a rehabilitative component to his incarceration.

## D. THE 2017 PPO

In 2017, shortly before respondent was paroled, petitioner filed a second petition for a PPO against respondent, alleging that the Department of Corrections had advised her to do so. The trial court denied petitioner's petition.[5]

## E. THE 2017 PAROLE

Respondent was paroled in June 2017 for fifteen months, or until September, 2018.[6] Respondent's parole conditions required respondent to wear a GPS tether for six months and to refrain from contact with petitioner.

## F. THE 2018 PPO

On April 13, 2018, petitioner filed a third petition for an ex parte PPO against respondent. Therein, petitioner noted respondent's earlier assault, threats, and stalking. She further recounted that respondent had repeatedly violated court orders. Petitioner also recognized that the trial court had denied her most recent PPO request, but respondent "ha[d] to apply yet again due to [respondent's] habitual lack of respect for the conditions of his parole." More specifically, petitioner claimed that "it was reported to [respondent's parole agent] . . . that [respondent] had been seen numerous times" on a road by her home and was told not to travel that road. And, just a week earlier, respondent had "followed" petitioner on Francis Road and then "continued to tailgate" her on Forest Hill Road, which was 500 feet from her home.[7] According to petitioner, as they "approached" petitioner's home, respondent "crept" past her vehicle "to be 'noticed' " before driving away. Petitioner alleged that she had reported this latest incident to respondent's parole agent, who, in turn, "made contact with [respondent] and let him know to stay away from" her. Because this was "another in a long line of acts showing continuous disregard for orders,"

---

[5] Petitioner alleged that she attached a copy of the 2017 PPO petition to the petition in this case, but it is not contained in the lower court file.

Although petitioner's later hearing testimony suggests that the court denied her 2017 PPO petition because respondent was incarcerated when it was filed, respondent's pleading suggests it was denied "as being without basis." During oral argument, petitioner's counsel represented that this request was denied without prejudice and could be pursued upon respondent's release from prison. And, in light of the requirement that respondent wear a GPS tether, petitioner did not request a PPO at that time.

[6] The parole board may not parole a prisoner until it has "reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety." MCL 791.233(1)(a).

[7] Respondent and petitioner lived approximately twelve miles from each other.

she urged the court to grant the PPO in order to ensure "justice [was] served should he violate once again." Petitioner ended by indicating that respondent's parole "coupled with continued acts of disregard and bullying . . . brought back memories of terror[.]"

## 1. THE 2018 EX PARTE PPO

On April 13, 2018, based on petitioner's allegations, the trial court entered an ex parte PPO. The PPO prohibited respondent, in relevant part, from "assaulting, attacking, beating, molesting, or wounding" petitioner and her children and from "threatening to kill or injure" them. The order also prohibited respondent from stalking petitioner as defined by MCL 750.411h and MCL 750.411i, and from being "within a 1[-]mile radius of [p]etitioner's home for any reason." The PPO was to remain in effect until December 31, 2028, or for more than 10½ years. Five days later, the trial court entered an amended PPO with like conditions.

## 2. RESPONDENT'S MOTION TO TERMINATE THE 2018 EX PARTE PPO

On May 7, 2018, after being served, respondent filed a motion to terminate the ex parte PPO. Respondent explained that his parole agent had contacted him on Tuesday, April 10, 2018, and advised him of petitioner's accusation that he was stalking her and/or driving on a road near her home four days earlier between the hours of 5 and 6 p.m.[8] Respondent added that he had not "traveled down Forest Hill Road since . . . 2013 and ha[d] absolutely no desire or intention in doing so now or . . . in the future." Respondent further stated that he had never driven a black Jeep, and that on April 6, 2018, he and his wife left home at 7:00 a.m. "in a vehicle other than a black Jeep[.]"[9] Respondent then dropped his wife off at work at 8:00 a.m., drove himself to work, and, after finishing for the day, picked his wife up at 5:00 p.m. in Lansing. Pursuant to an earlier group text, respondent and his wife stopped to buy the ingredients for that evening's dessert. Respondent provided a receipt from Sam's Club, time-stamped 5:23 p.m., a receipt from a Meijer in Lansing, and a printout of the earlier group texts. Respondent further stated that he had "no desire to have any contact or communication with the petitioner[.]" Respondent noted that there was a no-contact order in place (presumably referring to his parole conditions) and that he was "very willing and happy to abide" by it. Respondent repeated that he did "not want any contact with the petitioner and fear[ed] that her continued false accusations" would "jeopardize his freedom[.]"

---

[8] Respondent's attorney later explained that, despite his repeated attempts to narrow the timeframe for the April 6th incident, respondent's parole agent would not share this information. Because the report was made on Friday, a workday, and respondent was led to believe that it occurred after petitioner finished work for the day, respondent and his attorney focused on a timeframe consistent with typical work hours.

[9] The petition for the ex parte PPO did not mention a black Jeep, but petitioner later testified that a black Jeep was following her.

On June 27, 2018, respondent, through counsel, filed an amended response, contending that respondent had picked up his pregnant wife after 5:46 p.m. on Friday, April 6th. As such, respondent asserted that petitioner's contention that he had followed her on that day was false.

### 3. THE 2018 HEARING

On July 5 and August 15, 2018, the trial court held a hearing on respondent's motion to terminate the PPO.[10] The trial court took judicial notice of respondent's 2013 assault conviction and the 2013 PPO,[11] noting that it had presided over both matters.

At the hearing, petitioner testified that on April 6th she was driving home on Forest Hill Road and noticed a black Jeep "tailgating" her sometime between 10:30 a.m. to 11:30 a.m., but probably "closer to eleven a.m." According to petitioner, the Jeep passed by her vehicle "at a creeping pace, and [she] noticed that it was [respondent] with a light gray sweatshirt on." Petitioner testified that when she saw respondent, "the instant trauma brain panic just settled in" because she did not think respondent was allowed to travel down Forest Hill Road, which was near her home. Petitioner began texting her husband, explaining that she did not "like the following business because that's where we started before when we had the prior situation wherein the stalking was an issue[.]" When asked if she could be mistaken in her identification of respondent, petitioner remained firm, stating that she did not believe she was.

Petitioner, who was in contact with a victim-services coordinator, explained that she quickly reported the alleged incident to respondent's parole agent, leaving him two messages. The following Monday morning, respondent's parole agent told petitioner that he would look into her allegation and mentioned that there was no current PPO on file. Petitioner told respondent's parole agent that she "was very uncomfortable" with respondent's actions, but she did not state that she felt "threatened by his behavior[.]"

Petitioner continued emailing with the victim-services coordinator, who advised her to file the PPO petition. Petitioner did so on April 13th.

Contrary to respondent's assertions in his motion to terminate the 2018 PPO, petitioner testified that she had seen respondent on Forest Hill Road at least three times, including once with his visibly pregnant wife in the Jeep in March. Petitioner did not report this contact because it occurred five minutes from her home when they were both driving and petitioner believed "it's happenstance." Petitioner volunteered that she did not understand why respondent's attorney had gathered information pertaining to the evening of April 6th because it had nothing to do with the 11 o'clock timeframe that she had reported to respondent's parole agent.[12]

---

[10] The hearing was continued to a second day in light of respondent's lack of notice regarding the timeframe of the alleged vehicle-following incident on April 6th.

[11] The 2013 PPO expired in December 2015 while respondent was incarcerated. Petitioner did not seek to have the PPO extended in the manner permitted by MCR 3.707(B).

[12] See footnote 8.

Respondent testified at the hearing in greater detail concerning the same facts described in his motion to terminate the ex parte PPO. Respondent also called numerous witnesses to corroborate his testimony.

Contrary to petitioner's hearing testimony regarding her positive identification of respondent, respondent's parole agent testified that petitioner had reported that the Jeep's driver "could have been" respondent. After investigating petitioner's allegations by talking to respondent, respondent's wife, and respondent's mother-in-law, respondent's parole agent concluded that respondent had not violated his parole because the black Jeep owned by respondent's wife had been parked in their driveway and the couple had used a different vehicle to travel to work on April 6th. Moreover, contrary to petitioner's allegations, petitioner had never reported to respondent's parole agent that respondent had been around her home several times. In fact, respondent volunteered to be placed on a GPS tether again in order to avoid future allegations by petitioner against him. In sum, to respondent's parole agent's knowledge, respondent was fully compliant with his parole conditions.

Respondent's wife testified that after respondent was paroled in June of 2017, he lived with her. Contrary to petitioner's testimony, respondent's wife testified that to her knowledge, respondent had never been in contact with petitioner. Respondent's wife further testified that respondent had never driven her Jeep because she used it to drive to work before March 30, 2018. In fact, respondent's wife was confident that the Jeep had been parked in their driveway on April 6th because she and respondent had recently begun commuting together since they were now working in the same vicinity and could save money doing so in the weeks before she gave birth. And, finally, respondent's wife testified that she did not recall ever making eye contact with petitioner while she was driving.

Respondent testified that he did not follow petitioner as alleged in her PPO petition. Indeed, respondent had had no contact with petitioner since being paroled in June 2017, and he had done nothing since his release to warrant the issuance of a PPO. Moreover, when respondent encountered petitioner's ex-husband and her daughter while at a restaurant with his wife and mother-in-law, he immediately contacted his parole agent to inform him of this chance encounter and his party left after finishing their food.

Respondent drove a 2017 Dodge Ram and he had never driven his wife's Jeep, rendering impossible petitioner's testimony that she had encountered the couple on several occasions while he was driving that vehicle. Respondent further testified that he never traveled on Forest Hill Road.

On April 6th, respondent was working with Joshua Eyer, hanging drywall. Respondent used his credit card to purchase gas at one Speedway gas station and lunch from another Speedway nearby. Videotape from the second Speedway showed respondent there at 12:15 p.m. At that point, respondent was approximately an hour from respondent's home. A rewards receipt confirmed that respondent had purchased fuel at the first Speedway at 8 a.m. and other food items shortly after noon.

Eyer also testified that he and respondent were hanging drywall on April 6th. Eyer also confirmed that he and respondent went to lunch at Speedway and returned to work. Eyer's girlfriend further supported respondent and Eyer's testimony that they had worked that day.

After the May 2018 hearing date, respondent had twice seen petitioner at a mall close to where he worked. Both times, respondent avoided any contact and reported these near encounters to his parole agent.

At the close of testimony, the trial court denied respondent's motion to terminate the ex parte PPO. The court discussed the parties' focus on the April 6th incident, inquiring whether there was anything additional in light of respondent's 2013 PPO and criminal conviction. Respondent's counsel explained that he saw the question as being whether the April 6th incident prompted petitioner's filing. The court retorted that it viewed the matter more broadly, adding that petitioner "articulated and demonstrated concerns and fear" of respondent, and given respondent's previous assault against petitioner, petitioner would want a PPO against respondent because "there are long[-]term emotional injuries that exist well beyond what may have resolved physically." Although the trial court recognized that this put respondent in the position of wondering whether the matter was "ever over for him," it suggested that petitioner would "have legitimate reasons" to seek a PPO in light of her "significant injuries." The court ended by stating that petitioner "always has the opportunity . . . to come in and say hey, look, I'm over it, I'm done, I want to just let it go."

## 4. RESPONDENT'S MOTION FOR RECONSIDERATION

Respondent subsequently filed a motion for relief from judgment, a judgment notwithstanding the verdict, a new trial, for reconsideration, and for correction of the record, which the trial court treated as a motion for reconsideration. Respondent argued that the PPO should have been terminated because the trial court essentially determined that the allegations concerning the April 6th incident did not occur, and the trial court did not make any other findings that would justify the continuance of the PPO. Respondent also argued that the trial court therefore improperly denied respondent's motion to terminate the PPO solely on the basis of his history with petitioner. The trial court denied respondent's motion in an order that included the following language:

> [T]his Court could not conclude that [r]espondent had chased and tailgated [p]etitioner. The Court did, however, note that [p]etitioner remains justifiably frightened and fearful of [r]espondent given that he had severely beaten her several years prior, resulting in [r]espondent's incarceration with the Michigan Department of Corrections. The Court further concluded that a reasonable person would feel frightened and terrorized by [r]espondent, given the extent of physical and psychological damage and harm he inflicted on [p]etitioner.

This appeal followed.

## II. ANALYSIS

On appeal, respondent argues that the trial court abused its discretion by denying his motion to terminate the ex parte PPO. Respondent also argues that there was insufficient evidence to establish reasonable cause to satisfy MCL 600.2950 because "the allegations Petitioner made in seeking a PPO were proven false, and nothing has occurred since Respondent's release from prison to justify a new PPO[.]"

This Court reviews a trial court's decision regarding the termination of a PPO for an abuse of discretion. *Pickering v Pickering*, 253 Mich App 694, 700-701; 659 NW2d 649 (2002). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016).

MCL 600.2950(4) requires a trial court to issue a PPO "if the court determines that there is reasonable cause to believe that the individual to be restrained . . . may commit 1 or more of the acts listed in [MCL 600.2950(1)]." In the context of probable cause for an arrest, " '[r]easonable cause' " [has been described as] having enough information to lead an ordinarily careful person to believe that the defendant [had] committed a crime." *People v Freeman*, 240 Mich App 235, 236; 612 NW2d 824 (2000), citing CJI2d 13.5(4) [now M Crim JI 13.5(2)]. Thus, the question here is whether the known facts in this case are such that they would cause a reasonable person to reasonably conclude that respondent may commit one or more of the acts listed in MCL 600.2950(1). The words "may commit" are forward-looking in contrast to a backward-looking, past-tense word like "committed." Compare 600.2950a(3) (the court may issue a PPO "if the respondent has been convicted of a sexual assault of the petitioner, or the respondent has been convicted of furnishing obscene material to the petitioner[.]"); see also *IME v DBS*, 306 Mich App 426, 436; 857 NW2d 667 (2014) (the fact that a respondent's status as having been convicted of sexually assaulting the petitioner satisfies the minimum requirements for issuing a PPO does not violate due process). Moreover, the word "may" suggests that the known facts demonstrate a possibility, rather than a probability or certainty, that respondent will commit 1 or more of the acts listed in MCL 600.2950(1).

In pertinent part, the acts included in MCL 600.2950(1) are "[a]ssaulting, attacking, beating, molesting, or wounding" and "[a]ny other specific act or conduct that imposes upon or interferes with personal liberty or that causes a reasonable apprehension of violence" if those acts are committed by a former dating partner or one who previously shared another's home.

The petitioner has the initial burden of demonstrating to the trial court that there exists reasonable cause for the trial court to issue a PPO, and then "of establishing a justification for the continuance of a PPO at a hearing on the respondent's motion to terminate the PPO[.]" *Hayford v Hayford*, 279 Mich App 324, 326; 760 NW2d 503 (2008). In deciding whether to issue a PPO, the trial court must consider "[t]estimony, documents, or other evidence offered in support of the request" for a PPO. MCL 600.2950(4)(a). Pursuant to MCL 600.2950(4)(b), the trial court must also consider whether the respondent has "previously committed or threatened to commit" an act listed in MCL 600.2950(1).

In this case, the record certainly supports the trial court's determination that respondent had previously committed one the prohibited acts by MCL 600.2950(1), when he assaulted and wounded petitioner in 2013. Indeed, the trial court took judicial notice of respondent's 2013 conviction for assault with intent to do great bodily harm less than murder in relation to injuries that he had inflicted upon petitioner five years earlier. See MCL 600.2950(4)(b). The hearing testimony also supported the trial court's conclusion that respondent's previous actions caused "a reasonable apprehension of violence" on the part of petitioner, leading her to seek the 2013 PPO, of which the trial court also took judicial notice. See MCL 600.2950(1)(*l*). More specifically, petitioner testified that she was "very uncomfortable" and "the instant trauma brain panic just settled in" when she believed she saw respondent near her home in April 2018.

But the reality is that petitioner had not seen respondent near her home. As recognized by the trial court, petitioner did not meet her burden of showing that respondent was near her home. To the contrary, respondent presented proof through receipts, witnesses, and a videotape that he was over an hour away when petitioner claims she saw him purposefully following her near her home before he deliberately slowed down so that she would notice him before he drove off.

The record plainly demonstrates that petitioner and respondent were no longer in a dating relationship and did not live together. Petitioner married another man. Likewise, respondent married another woman, and, recently, his wife gave birth to their child. At his original sentencing, respondent apologized for his actions and had already successfully completed seminars addressing anger resolution and familial relationships. And, after completing a 34-month prison sentence, respondent was paroled. At the hearing on respondent's motion to terminate the PPO, respondent testified that he had no desire to have any contact or communication with petitioner. Respondent further described various situations where he avoided contact with petitioner as well as her family members. Respondent even offered to resume wearing a GPS tether in order to be able to document his whereabouts and to demonstrate his commitment to avoiding contact with petitioner.

Like the trial court we acknowledge petitioner's fear that respondent's past conduct may reoccur; nevertheless, the court must render its decision based on known objective information giving rise to reasonable cause. And, although past is often prologue, we must recognize that is not always necessarily so. The circumstances under which respondent assaulted petitioner in 2013 are vastly different than those that existed in 2018. Based on the evidence and testimony presented in this case, a reasonable person could not reasonably conclude that there was a possibility that respondent would assault petitioner or engage in other specific acts or conduct that caused a reasonable apprehension of violence in petitioner in the future just because respondent had done so five years earlier.

Indeed, petitioner sought the PPO because she believed that respondent was violating his parole conditions by engaging in the alleged April 6th vehicle-following incident, not because of respondent's past actions. This is why the parties focused on the April 6th event at the hearing. Certainly, if the facts demonstrated that respondent had been following petitioner, a reasonable person could conclude that petitioner met her burden of showing that respondent might commit one of the prohibited acts under MCL 600.2950(1). However, the known objective evidence below established that respondent had not followed petitioner and was fully compliant with his

-10-

parole conditions. Accordingly, the trial court abused its discretion in denying respondent's motion to terminate the PPO.

Reversed and remanded for entry of an order granting respondent's motion to terminate the PPO. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Michael F. Gadola
/s/ Thomas C. Cameron